## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNDER SEAL,<br><br>                    Plaintiffs,<br><br>          v.<br><br>UNDER SEAL,<br><br>                    Defendants. | Case No: 19-495<br><br><br>COMPLAINT<br><br><br>FILED UNDER SEAL PURSUANT TO<br>31 U.S.C. §3730(b)(2) |

# <u>DO NOT PLACE ON PACER</u>

593828.1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES ex rel. JOHN DOE, | Case No: 19-495 |
| Plaintiffs, | |
| v. | COMPLAINT FOR VIOLATIONS OF THE FALSE CLAIMS ACT 31 U.S.C. 3729, *et seq.* |
| DR. JAMES D. LUKETICH, UNIVERSITY OF PITTSBURGH MEDICAL CENTER, AND UNIVERSITY OF PITTSBURGH PHYSICIANS, | JURY TRIAL DEMANDED |
| Defendants. | FILED UNDER SEAL PURSUANT TO 31 U.S.C. §3730(b)(2) |

**FILED**

APR 3 0 2019

CLERK U.S. DISTRICT COURT
WEST. DIST. OF PENNSYLVANIA

593828.1

Table of Contents

I.      INTRODUCTION ...................................................................2
II.     PARTIES ...............................................................................6
III.    JURISDICTION AND VENUE ...............................................7
IV.     APPLICABLE LAW ...............................................................8
        A.    The False Claims Act ...................................................8
        B.    The Medicare Program ................................................8
        C.    Other Federal Health Care Programs .......................13
              1.    Medicaid...........................................................13
              2.    Federal Employee Health Benefits Plan .........14
              3.    TRICARE and CHAMPVA ...............................14
        D.    Teaching Hospitals .....................................................14
V.      DEFENDANTS' FRAUDULENT PRACTICES ......................17
        A.    Luketich Routinely Conducted Multiple Concurrent and/or
              Overlapping Surgeries Resulting in Medically Unnecessary
              Procedures and Extreme Patient Harm................................17
        B.    Luketich Routinely Billed For Procedures Performed By
              Unsupervised Residents in Violation of Material Requirements
              for Payment .................................................................23
        C.    Luketich Routinely Elected to Partially Complete Single
              Procedures as Medically Unnecessary Multi-day Surgeries
              Resulting in Patient Harm ...........................................24
        D.    Luketich Routinely Billed for Medically Unnecessary
              Admissions in Order to Increase Billings and Have a Steady
              Stream of Patients Readily Available.................................25
        E.    Luketich Systematically Upcoded a Routine Procedure as a
              More Complex and Expensive Procedure.............................26
        F.    Other Harmful and Unlawful Practices.............................28
        G.    Defendant UPMC Knows About Luketich's Conduct And Has
              Ignored It .................................................................29
VI.     DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT.............31

Through his attorneys, Plaintiff and *qui tam* Relator John Doe ("Relator") alleges for his Complaint against Defendants Dr. James D. Luketich ("Luketich"), University of Pittsburgh Medical Center ("UPMC"), and the University of Pittsburgh Physicians ("UPP"), collectively "Defendants" as follows:

## I.    **INTRODUCTION**

1.      This is an action to recover damages and civil penalties on behalf of the United States Government (the "United States") arising from false and/or fraudulent statements, records, claims made and caused to be made by the Defendants and/or their agents and employees in violation of the Federal False Claims Act, 31 U.S.C. §3729, *et seq*., as amended ("FCA").

2.      This case involves egregious examples of healthcare providers systematically placing profit over the well-being of patients, with devastating consequences for individuals who trusted them to provide the top of the line care that UPMC advertised.   UPMC holds itself out as world-renowned health care provider of high quality "patient-centered" care.  Luketich's systematic practice of engaging in concurrent surgeries, each lasting for hours, for different patients, in different operating rooms has left patients unconscious, paralyzed, intubated and on the ventilator for longer than medically necessary, often in the care of trainees without the backup of a properly qualified surgeon.  UPMC proudly describes that its Department of Cardiothoracic Surgery, under the direction of Dr. James Luketich, is recognized as one of the most active practices in the United States. Because of its volume, experienced surgeons, and innovative techniques, the cardiothoracic surgery practice attracts patients and surgical trainees from Pittsburgh and around the globe.

3.      Those glowing descriptions mask that Defendant Luketich has, with the knowledge and acquiescence of Defendant UPMC, systematically billed for medically unnecessary procedures, procedures that were not performed, and

2

procedures performed in violation of applicable law and regulations.  This conduct has resulted in documented harm to numerous patients while also producing large unlawful and unjustified financial rewards for the Defendants at the expense of the United States.

4.      As set forth in detail below, Luketich's conduct falls into several broad categories.  Based upon the Relator's personal knowledge, the conduct alleged in this Complaint is ongoing since at least 2015 and upon information and belief was occurring well before that.

5.      First, Luketich billed for personally performing multiple procedures in different operating rooms at the same time, which was physically impossible and which he in fact did not personally perform.  As a result of his not being available for scheduled surgeries, patients were left on operating tables for grossly excessive periods of time and suffered grievous injuries.  Research shows that prolonged operating time is associated with a significant increased risk of complications, with risk increasing 14% with each additional 30 minutes of operating time.  Hang Cheng, et al., *Prolonged Operation Duration is Associated with Complications: A Systematic Review and Meta-Analysis*, Journal of Surgical Research 134 (Sept. 2018).  Luketich carried out these practices in part by listing himself as a co-surgeon or assistant in violation of the prohibition on teaching physicians billing as a co-surgeon when a qualified resident was available.  Not only were qualified residents available, operating room reports show that qualified residents were in fact participating in and/or performing the procedures.

6.      Second, Luketich relied extensively on the work of unsupervised residents and fellows to perform the surgeries when he was not present during required parts of the surgery or immediately available in violation of Medicare requirements designed to ensure patient safety.

7.      Third, Luketich elected to only partially complete individual surgical

3

procedures, requiring the same patient to return to the operating room multiple times on different days and sometimes days later during the same admission when multiple operations were not medically reasonable, indicated or necessary.  This practice resulted in documented complications and harm to the individual patients.

8.      Fourth, in order to have a steady stream of patients available, Luketich scheduled patients for surgeries that could not be completed on the scheduled operative day given his over-commitments and then admitted the patients for medically unindicated reasons in order to have them available when they fit into his schedule.

9.      Fifth, Luketich systematically falsely upcoded a routine thoracic procedure – a wedge resection – as a more expensive and complex procedure – a segmentectomy – which the operative and/or pathology reports demonstrate it was not.  Luketich caused and or instructed residents and other doctors to engage in this fraudulent practice and disguise it by recording the procedure as a "nonanatomic segmentectomy," "nonanotomical segmentectomy" and , or "wedge segmentectomy" which are not real procedures.  This practice was also harmful to patients, whose disease may have been inadequately treated and gave the patients a false sense of security when they did not receive the procedure for which UPMC doctors billed and the patients were told they did receive.  This practice also led to the placement of this false statement into the patient's medical record which would affect future clinical treatment as it relates to cancer recurrence and survival.

10.      Finally, Luketich engaged in a number of other harmful and unlawful practices, including performing additional medically unnecessary surgeries on patients for reasons of profit rather than the interest of patients.  These included, among other examples, performing surgery on patients with metastatic cancer, for whom surgery was not medically indicated.   In recent years, Luketich has also been under the influence of an opiod – Suboxone – while performing procedures and has

4

fallen asleep during surgery.  The medical services provided in these circumstances have been at a best nonconforming and in some cases worthless.

11.     As the Chairman of UPMC's Department of Cardiothoracic Surgery, Luketich caused other physicians to follow his dangerous practices, creating a culture of placing profits above patient safety.

12.     These and other similar practices are set forth in detail below.  As a result of the conduct described in this Complaint, Defendants not only caused serious harm to numerous patients, they also vastly overcharged the United States for medical services.  Because Luketich was a high earner and head of a flagship UPMC program that brought in millions in revenue every year, UPMC and UPP consistently looked the other way, notwithstanding numerous detailed reports to UPMC administration.

13.     As a direct result of Defendants' fraudulent practices, the United States has been damaged in an amount that cannot yet be determined precisely, but that is estimated to be in the tens of millions of dollars.

14.     Relator has standing to initiate a legal action on behalf of the United States in order to redress the wrongdoing alleged in this Complaint pursuant to the *qui tam* provisions of the FCA.

15.     The FCA was originally enacted in 1863 and was substantially amended in 1986 by the False Claims Amendments Act.  Congress enacted the 1986 amendments to enhance and modernize the Government's tools for recovering losses sustained by frauds against it after finding that federal program fraud was pervasive. The amendments were intended to create incentives for individuals with knowledge of Government frauds to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit resources to prosecuting fraud on the Government's behalf.  Congress amended the Act again in 2009 and 2010 to address court interpretations of the Act that were inconsistent with

Congress's intent in modernizing the statute.

16.     The FCA imposes liability on anyone who, *inter alia*: (a) knowingly presents, or causes to be presented, false or fraudulent claims for payment or approval to the United States Government; (b) knowingly makes, uses, or causes to be made or used false records and statements to induce the Government to pay or approve false and fraudulent claims; (c) conspires to defraud the Government by getting a false or fraudulent claim allowed; or (d) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government.

17.     Any person who violates the FCA is liable for a civil penalty for each violation, plus three times the amount of the damages sustained by the United States.

18.     The FCA allows any person having information about false or fraudulent claims to bring an action for the person and the United States, and to share in any recovery.  The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on the defendants during that time).

19.     *Qui tam* plaintiff and relator John Doe brings the current action based on the FCA and seeks through this action to recover damages and civil penalties arising from the Defendants' knowing fraud on the United States.

## II.    **PARTIES**

20.     Relator John Doe ("Relator") resides in the Western District of Pennsylvania.  The Relator has direct personal knowledge of the allegations in this complaint.

21.     Defendant Dr. James Luketich is the Chairman of the Department of Cardiothoracic Surgery at the University of Pittsburgh Medical Center.  He works primarily at UPMC Presbyterian-Shadyside Hospital.  His publicly reported annual compensation for 2017 was $2.44 million, which ranked him among the top ten

6

highest paid UPMC employees.  He also contracts with University of Pittsburgh Physicians practice group to provide physician services.

22.     Defendant University of Pittsburgh Medical Center ("UPMC") is a nonprofit corporation organized under the laws of the State of Pennsylvania with its principal place of business in Pittsburgh, Pennsylvania. UPMC is a teaching hospital and has one of the largest medical residency programs in the country, with more than 1900 medical residents and clinical fellows. The cardiothoracic surgery residency program is the largest in the country, with 22 residents in the program. UPMC reported total operating revenue of $16 billion for calendar year 2017.

23.     Defendant University of Pittsburgh Physicians ("UPP") is a multi-specialty practice group that provides physician services to patients, including surgeries performed by thoracic surgeons.   UPP is a Pennsylvania nonprofit organization, whose sole member is UPMC.

## III.    <u>JURISDICTION AND VENUE</u>

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730.

25.     There has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint within the meaning of 31 U.S.C. § 3730(e)(4)(1986) or as that section was amended in 2010.  Moreover, even if such a disclosure had occurred, the Relator would qualify as an original source of the information in this Complaint under either version of the statute.

26.     This Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) because that section authorizes nationwide service of process and because the Defendants have minimum contacts with the United States and transact substantial business in the Western District of Pennsylvania.

27.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in, and acts proscribed by 31 U.S.C. § 3729 were committed in, the Western District of Pennsylvania.

## IV.    APPLICABLE LAW

### A.     The False Claims Act

28.     The False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*., as amended, prohibits any person from knowingly making, or causing to be made, a false or fraudulent claim for payment to the United States. 31 U.S.C. § 3729(a)(1)(A).  The FCA also prohibits knowingly making, using, or causing to be made or used a false record or statement material to a false or fraudulent claim. 31 U.S.C. § 3729(a)(1)(B).   In addition, the FCA prohibits knowingly making, using, or causing to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States. 31 U.S.C. § 3729(a)(1)(G).

29.     A false or fraudulent claim under the FCA may take many forms, "the most common of which is a claim for payment for goods and services not provided or provided in violation of contract terms, specification, statute or regulation." False Clams Amendment Act of 1986, S. Rep. No. 99-345, at 9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5274.

30.     The misrepresentation must be material, which the FCA defines to mean "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

31.     The FCA defines knowingly to include actual knowledge, reckless disregard, and deliberate ignorance. 31 U.S.C. § 3729(b)(1)(A).  No specific intent to defraud need be shown.  31 U.S.C. § 3729(b)(1)(B).

### B.     The Medicare Program

32.      In 1965, Congress enacted Title XVIII of the Social Security Act,

8

known as the Medicare program, to pay for the costs of certain healthcare services. The Department of Health and Human Services ("HHS") is responsible for administering and supervising the Medicare program. The Center for Medicare and Medicaid Services ("CMS") is a component of HHS and is directly responsible for administering the Medicare program.

33.     At all times relevant to this lawsuit, except where a different time period is specified, the following statutory and regulatory rules applied to the Medicare program:

34.     Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426A.

35.     The Medicare regulations define a "provider" to include "a hospital . . . that has in effect an agreement to participate in Medicare." 42 C.F.R. § 400.202.

36.     Individuals who are insured under Medicare are referred to as Medicare "beneficiaries."

37.     There are four Parts to the Medicare Program:  Part A authorizes payment for institutional care, including inpatient hospital care, skilled nursing facility care, and home health care, *see* 42 U.S.C. §§ 1395c-1395i-4; Part B primarily covers outpatient care, including physician services and ancillary services, *see* 42 U.S.C. § 1395k; Part C is the Medicare Advantage Program, which provides Medicare benefits to certain Medicare beneficiaries through private health insurers, *see* 42 U.S.C. § 1395w-21, *et seq.*; and Part D provides prescription drug coverage, *see* 42 U.S.C. § 1395w-101, *et seq.*; 42 C.F.R. § 423.1, *et seq.*

38.     Since November 2006, CMS has contracted with Medicare Administrative Contractors ("MACs") to assist in the administration of Medicare Parts A and B.  *See* Fed. Reg. 67960, 68181 (Nov. 2006).  MACs generally act as CMS's agents in reviewing and paying Part A and Part B claims submitted by healthcare providers and perform administrative functions on a regional level.  *See*

9

42 C.F.R. § 421.5(b); *see also* 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104.

39.     Under the Medicare program, CMS (through MACs) makes payments prospectively for hospital inpatient services, through periodic payments and the cost-report reconciliation process described below, and retrospectively for hospital outpatient services, after the services are rendered.

40.     Upon discharge of Medicare beneficiaries from a hospital, the hospital submits Medicare Part A claims for reimbursement for inpatient items and services delivered to those beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Inpatient services are paid using the Inpatient Prospective Payment System. In addition, designated hospital outpatient items and services are paid under the Outpatient Prospective Payment System. Hospitals submit claims for Medicare reimbursement using the electronic claim form known as the 837I or its paper equivalent, Form CMS-1450 (also known as the UB-04). The claim form instructions, found in Chapter 25, section 75 of the Claims Processing Manual, set forth the Medicare requirements for use of the various codes in completing the form.

41.     When physicians provide patient care services in a hospital setting, whether to hospital inpatients or outpatients, they (or an entity to which they have assigned billing rights) may bill Medicare for their "professional" services, which include performing procedures and interpreting test results, using a CMS Form 1500. The hospital may submit a separate claim to Medicare for the "technical" or "facility" component of the services rendered, as described in the preceding paragraph, under which the hospital is reimbursed for furnishing, among other things, equipment and non-physician staff.

42.     Providers must be enrolled in Medicare in order to be reimbursed by the Medicare program. *See* 42 C.F.R. § 424.505. To enroll in Medicare,

institutional providers such as hospitals periodically must complete a Medicare Enrollment Application (often called a Form CMS-855A). In completing the Medicare Enrollment Application, an institutional provider certifies:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. ***I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Law)***, and on the provider's compliance with all applicable conditions of participation in Medicare (emphasis added).

The Medicare Enrollment Application also summarizes the False Claims Act in a separate section that explains the penalties for falsifying information in the application to "gain or maintain enrollment in the Medicare program."

43. Medicare enrollment regulations further require providers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1).

44. Medicare pays only for services that are reasonable and necessary for the diagnosis or treatment of illness or injury to improve the functioning of a malformed body member. 42 U.S.C. §1395y(a)(1)(A).

45. As a prerequisite to Medicare payment under Medicare Part A, CMS also requires hospitals to submit annually a form CMS-2552, commonly known as a hospital cost report. A cost report is the final claim that a provider submits to a MAC for items and services rendered to Medicare beneficiaries during the year covered by the report.

46. After the end of each of a hospital's fiscal years, the hospital files its hospital cost report with the MAC, stating the amount of Part A reimbursement the

11

provider believes it is due for the year, or the amount of excess reimbursement it has received through interim payments during the year that it owes back to Medicare. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

47.     Medicare Part A payments for Social Security Act section 1886(d) hospital services, *see* 42 U.S.C. § 1395ww, are determined under a prospective payment system using the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s and UB-04s) during the course of the fiscal year. On the hospital cost report, the prospective payments for services are added to any other Medicare Part A add-on payments due to the provider. This total determines Medicare's liability for services rendered to Medicare Part A beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Part A program or the amount due the provider.

48.     Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

49.     That chief administrator or designee is required to certify, in pertinent part:

> [T]o the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

50.     The hospital cost report certification page also includes the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

51.     Thus, a provider must certify: (1) that the filed hospital cost report is truthful, *i.e.,* that the cost information contained in the report is true and accurate; (2) that it is correct, *i.e.,* that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) that it is complete, *i.e.,* that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in compliance with applicable laws and regulations.

52.     A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports) to its MAC.

53.     Medicare, through its MACs, has the right to audit a provider hospital's cost reports and financial representations to ensure their accuracy and preserve the integrity of the Medicare Trust Funds.  This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made.  *See* 42 C.F.R. § 413.64(f).

### C.     **Other Federal Health Care Programs**

#### 1.     Medicaid

54.     Congress created Medicaid at the same time it created Medicare in 1965 by adding title XIX to the Social Security Act.  Medicaid is a joint federal

13

and state program that provides payment for medical services primarily for low-income patients. While specific coverage varies from state to state, Medicaid coverage generally follows Medicare coverage.

### 2. Federal Employee Health Benefits Plan

55. The Federal Employee Health Benefits Plan ("FEHBP") provides health insurance for covered federal employees, retirees and their dependents. FEHBP plans are managed by the U.S. Office of Personnel Management.

### 3. TRICARE and CHAMPVA

56. TRICARE is a federal program that provides civilian health insurance coverage for certain military personnel, retirees and their dependents. Tricare is administered by the Department of Defense and funded by the federal government.

57. CHAMPVA is a health care program for families of veterans with 100 percent service related disabilities and is administered by the Department of Veterans Affairs.

### D. Teaching Hospitals

58. In a teaching hospital like UPMC, a condition of payment for physician services under Medicare Part B is that, the services must be provided personally by a physician who is not a resident or by a resident in the presence of a fully-licensed teaching physician. 42 C.F.R. § 415.170. A resident is an individual who participates in an approved graduate medical education program. *See* CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, §100. A teaching physician is defined as a physician, other than a resident, who involves residents in the care of his or her patients. *Id.*

59. If a resident participates in a procedure, the service may be billed to Medicare if the teaching physician is physically present for the "key portions" or "critical portions" of any service or procedure for which the payment is sought. 42 C.F.R. § 415.172(a)(1); CMS Medicare Claims Processing Manual, Rev. 4173

(11-30-2018), Chapter 12, § 100.1 (Payment for Physician Services in Teaching Settings).

60.    In the case of surgery or other complex procedures, such as all the procedures at issue in this Complaint, the teaching physician must be present for all critical portions of the procedure and "immediately available" during the entire service or procedure.  42 C.F.R. § 415.172(a)(1); CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, § 100.1.2 (Surgical Procedures).  UPMC procedures define "immediately available" as "located on the hospital campus, reachable through the standard paging system, and able to return immediately to the operating room or procedure area if called (i.e., not performing another procedure)."

61.    The teaching physician may only leave the first procedure and/or commence the second procedure when the key or critical portion of the first procedure is complete.  Surgical residents or fellows may finish the non-critical portion.  Surgeries in compliance with this rule are often called overlapping surgeries.

62.    Although a teaching physician may engage in two overlapping procedures, the critical portions of the procedures cannot occur at the same time.  CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, §100.1.2 (Surgical Procedures), at A.2.

63.    When a teaching physician becomes involved in a second procedure, he or she must assign another qualified physician to be immediately available.  CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, §100.1.2 (Surgical Procedures), at A.

64.    CMS will not pay for surgeries where the key or critical portions of each surgery take place at the same time, also known as concurrent surgery.  UPMC policies and procedures prohibit concurrent surgery except in very rare

15

emergent cases and then only for as short a time as possible pending arrival of the immediately available or on-call surgeon.

65.   When a teaching physician is participating in a second surgical procedure and "not present during the non-critical or non-key portions of the (prior) procedure … he/she must arrange for another qualified surgeon to immediately assist the resident in the other case should the need arise."  CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, § 100.1.2. (Surgical Procedures) at A.

66.   In the case of three overlapping surgeries, the role of the teaching physician is classified as "supervisory service" to the hospital and is not billed as physician service to a patient and is not payable under the physician fee schedule. CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, § 100.1.2. (Surgical Procedures), at A.2.

67.   In addition, at a teaching hospital, with limited exceptions, a physician may not bill as a co-surgeon or assistant at a surgery if a qualified resident is available.  42 C.F.R. §415.190; CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, § 100.1.7 (Assistants at Surgery in Teaching Hospitals).

68.   The conditions of payment for an assistant at surgery in a teaching hospital are that the services of the assistant:

> (1) Are required as a result of exceptional medical circumstances.
> (2) Are complex medical procedures performed by a team of physicians, each performing a discrete, unique function integral to the performance of a complex medical procedure that requires the special skills of more than one physician.
> (3) Constitute concurrent medical care relating to a medical condition that requires the presence of, and active care by, a physician of another specialty during surgery.

16

(4) Are medically required and are furnished by a physician who is primarily engaged in the field of surgery, and the primary surgeon does not use interns and residents in the surgical procedures that the surgeon performs (including preoperative and postoperative care).

(5) Are not related to a surgical procedure for which CMS determines that assistants are used less than 5 percent of the time.

42 C.F.R. § 415.190.

69.     When a teaching physician submits a claim for payment as a co-surgeon at a teaching hospital, the physician must certify that no qualified resident was available.   CMS Medicare Claims Processing Manual, Rev. 4173 (11-30-2018), Chapter 12, §100.1.7 (Assistants at Surgery in Teaching Hospitals).

## V.     DEFENDANTS' FRAUDULENT PRACTICES

### A.     Luketich Routinely Conducted Multiple Concurrent and/or Overlapping Surgeries Resulting in Medically Unnecessary Procedures and Extreme Patient Harm

70.     Luketich routinely billed for personally performing multiple procedures at the same time which resulted in significant harm to patients as well as overcharging, mischarging, and billing for medically unnecessary services.

71.     Luketich routinely engaged in a minimum of two concurrent surgeries scheduled a day – a major operation in each of his main operating rooms, operating room 26 ("OR 26") and operating room 27 ("OR 27").   At the same time he also participated in additional concurrent surgeries in other rooms.   Sometimes he would participate as the co-surgeon in operating room 25 ("OR 25"), and would also perform the critical portion of procedures in other rooms. These major surgeries would often be day-long complex procedures, such as esophagectomies, that would require the full-time presence of a fully licensed surgeon and would not ordinarily be performed on the same day as another procedure.   A surgeon would be dedicated to one such complex procedure a day.

72.     In addition to participating in multiple concurrent and/or overlapping complex surgeries, Luketich would also be participating in outpatient clinics and attending meetings at off-campus venues such that he was not immediately available, had not arranged for a properly qualified surgeon to assume care of the patient, and on occasion was located miles away from where his surgeries were being conducted.

73.     While it was not physically possible for one person to be in as many places at one time as Luketich claimed to be, Luketich and UPMC would bill for multiple procedures as if he personally performed all of them when they were in fact often performed by unsupervised residents and surgical trainees. Moreover, as a result of his overbooking of surgeries and failure to be present or assign other qualified attending surgeons, the surgeries were continued for extended periods of time causing substantial patient harm. Patients were often left on the operating table under anesthesia, paralyzed, intubated and dependent on the ventilator for extraordinary periods of time with often grievous complications. At the same time, the amount billed for these medically unindicated and unnecessary treatments substantially increased the amount the government paid for services provided to these patients.

74.     An extreme example of this practice was Luketich's work day on June 15, 2015. On that day Luketich was scheduled to perform surgeries in five different operating rooms on five different patients simultaneously. Luketich was listed as the primary surgeon in two rooms (OR 26 and OR 27) and the assistant in three of them (OR 12, OR 16 and OR 25). The operating room reports show that both major surgeries commenced on or about 7:49am and 8:08am. The procedures where Luketich was listed as an assistant commenced on or about 7:56am and 8:25am. While these operating times are extreme, the actual time the patients were under anesthesia was even greater.

18

75.     In one of the main operating rooms, OR 27, the patient was on the operating table from 8:08am to 10:37pm – 12.5 hours – for a procedure, a substernal gastric pullup, that should have taken 6 to 8 hours.  Residents performed critical parts of the surgery and then waited with the patient under anesthesia for Luketich, as he required them to do.   The patient was left with unsupervised surgical trainees while Luketich was involved with four other procedures in four different operating rooms and unavailable.   The patient suffered multiple complications, one of which included profound inflammatory response leading to the loss of her hand.  Luketich explained to the patient's family (as he did with many families) that this was an unfortunate but possible risk from surgery. However, it is not a risk when the surgery is completed within the expected time and when a surgeon is attentive to a patient and does not unnecessarily prolong the procedure.

76.     Complications like this, while atypical in most hospitals, continued to occur for Luketich's patients as he multitasked and scheduled more patients for surgery than anyone could handle.

77.     On a regular basis, Luketich would schedule three surgeries – two surgeries as primary physician and one surgery as an assistant.  Because CMS will not pay for a third concurrent procedure by a teaching physician, CMS Medicare Claims Processing Manual, Chapter 12, Rev. 4173 (11-30-2018), § 100.1.2 (Surgical Procedures), at A.2, Luketich would book the third surgery under a different surgeon's name.  Luketich would then attend the surgery and bill for it, and the surgeon who had been listed would not participate in the procedure.

78.     As an example, on November 17, 2017, Luketich was the primary surgeon for 3 operating rooms, OR 26, OR 27 and OR 16.  The procedure in OR 16 was scheduled under the name of another mid-career attending physician who

never participated.  The start and stop times for the three procedures show that the three procedures were completed concurrently.

79.     This practice of participating in multiple concurrent surgeries has resulted in serious patient harm.  Another example occurred on July 8, 2015, when Luketich was scheduled for OR 26 and OR 27 for operations commencing on or about 8:20am 9:40am.   At the same time Luketich was the assistant surgeon for a procedure in OR 16 which commenced on or about 8:27am.  Patient A in OR 26, for whom Luketich was the primary surgeon, suffered from lower extremity compartment syndrome as a complication of the prolonged operation, extended anesthesia and being on the operating table from approximately 9:40am to 8:15 pm, which is 10 and a half hours. Acute compartment syndrome occurs when swelling due to damage of healthy tissue leads to increased compartment pressures, a reduction of blood flow and tissue death.  In this particular case, the procedure that was performed, a pulmonary wedge resection and local chest wall resection, should have taken approximately four to six hours.   As compartment syndrome is not a complication of pulmonary resection, it is not a risk about which a surgeon would even advise the patient.  Yet in this instance, where the patient was left lying on their side for over ten hours, the patient did suffer compartment syndrome and had to have their leg cut open to relieve the pressure of their swelling muscles, have skin grafts performed, and was ultimately discharged to a rehabilitation center due to being unable to walk.  The discharge report for this patient stated: "Post operative course complicated by compartment syndrome resulting in fasciotomy and skin graft by ortho and plastics, wound infection requiring opening of thoracotomy wound and wound vac placement…. [patient] was discharged to MUH rehab…."

80.     The conduct of unnecessarily extending surgery times was potentially more acute in the case of patients who were veterans and or covered by the VA

healthcare system. Although Luketich had privileges at the VA Pittsburgh healthcare system, located only .6 miles from UPMC Presbyterian Hospital, he would require that surgical cases be brought from the VA hospital to his hospital, UPMC Presbyterian. Reportedly, there is a financial incentive to perform surgeries at UPMC on patients with VA healthcare.

81. In 2017, Patient B, a veteran, was taken to the operating room by Luketich to have the remainder of their right lung removed. The surgery started on or about 8:16am and was completed on or about 5:41pm, resulting in a surgical time of 9 hours and 25 minutes. For the majority of the operation, Luketich was not present in the operating room. The senior resident who performed the operation refused to dictate that Luketich was there for the critical portions of the procedure. As a result of being under anesthesia for that extended period, the patient suffered unrecognized loss of blood flow to their right leg. This complication ultimately required the patient to receive femoral to femoral artery bypass and amputation of their right lower extremity. In response to requests for a follow up visit, nurses documented that the patient "was adamant about never coming back to UPMC."

82. One way that Luketich implemented this scheme of performing multiple concurrent and/or overlapping surgeries was by improperly billing or causing others to bill his work as an assistant surgeon for procedures in violation of Medicare regulations.

83. At a teaching hospital, with limited exceptions physicians may not bill as an assistant surgeon if a qualified resident is available. 42 C.F.R. § 415.190. The purpose of this rule is to ensure that the Government, which already pays the hospital for the services of the resident through graduate medical education payments, does not pay for the same services twice. In submitting a claim for

payment for assisting a surgery, the teaching physician must attest that no qualified resident was available.

84.    Luketich routinely falsely certified, or caused others to certify, that no qualified resident was available for the procedures where he billed as a co-surgeon or assistant.  Operating room records show that not only were qualified residents available, but in fact a qualified resident was present during the procedure and participating in and/or performing the procedure.   The UPMC cardiothoracic surgery residency program is one of the largest in the country and not lacking in available qualified residents.  And as the operating room records show, the present and available residents were highly qualified, often senior residents close to graduating.

85.    For example, on December 4, 2017, Luketich billed for services as a co-surgeon to a fully-licensed doctor in OR 16, during the same time that Luketich was also performing for major surgeries in OR 26 and OR 27.  The operative note, dictated by the primary surgeon, attests that the primary surgeon was present the entire time and he understood that payment for an assistant surgeon at a teaching hospital is prohibited unless no qualified resident is available.  He then certified "that the services for which payment is claimed were medically necessary and that no qualified resident was available to perform the services."   In fact, as the operating room records show a qualified surgical resident, was not only available but was present in the operating room, performing the procedure, and completed the immediate post-operative report.

86.    In order to bill as a co-surgeon, Luketich would assert that the complexity of the procedure required it.  Yet the pre-published surgical schedule demonstrates that the cases for which Luketich bills as a co-surgeon are of known complexity and both scheduled and completed during the same time as his concurrently running operating rooms.  Luketich requires that he be listed as a co-

surgeon on cases without regard to the complexity of the case or seniority of the attending physician listed as the primary surgeon.

87.     The examples above illustrate a regular and ongoing practice. At least one of these examples was paid for by a federally funded program and given the volume of Medicare, Medicaid, and other federally funded patients that are treated in UPMC's Department of Cardiothoracic Surgery, there are many more examples of federally funded programs affected by this scheme.

**B.    Luketich Routinely Billed For Procedures Performed By Unsupervised Residents in Violation of Material Requirements for Payment**

88.     Teaching hospitals like UPMC do not bill Medicare for the services of residents, as Medicare already pays the hospital for these services through Graduate Medical Education payments. A teaching physician may bill for a procedure performed with a resident provided that certain criteria are met. The teaching physician must be present during the critical portions of the procedure and must be immediately available during the rest of the procedure. 42 C.F.R. § 415.172(a)(1). The purpose of this provision is to ensure patient safety by ensuring that residents, who are still in training, are adequately supervised.

89.     Luketich was consistently not "immediately available" for surgical procedures performed by his residents. Because he was routinely booked for multiple procedures at the same time, or was involved in other off-site events, he was not able to be immediately available. A significant number of procedures for which he billed included critical portions performed by unsupervised residents and trainees.

90.     For example, on January 12, 2017, Patient C was scheduled to undergo a paraesophageal hernia repair in OR 26 with Luketich as the primary surgeon. The operating report attests that Luketich was present for all key portions

23

of the surgery. In fact, he was at a meeting off-site. In text messages from Luketich to a resident performing the procedure, he explained that he was "in a high power meeting" and demanded that the resident be available to answer his phone calls. The resident completed the majority of the operation notwithstanding Luketich's attestation that he was present for all key portions of the procedure.

### C.   Luketich Routinely Elected to Partially Complete Single Procedures as Medically Unnecessary Multi-day Surgeries Resulting in Patient Harm

91.   In order to maximize the surgeries performed, Luketich scheduled surgeries that could not be completed appropriately on the date scheduled given his commitments. On the date of the scheduled operation, Luketich would elect to complete only part of the operation with the plan to bring the patient back to the operating room on a subsequent date for completion. These were not operations that would involve multi-day surgeries, but rather surgeries that he stopped and restarted for no medically indicated reason but rather for his own convenience and profit. For example, revision of a gastric bypass revision surgery or a conduit revision are not procedures that are ordinarily anticipated to be performed in multiple parts over multiple days.

92.   This practice led to significant patient harm as well as overcharging of the Government. For example, on February 15, 2016, Luketich was scheduled for two major surgeries in OR 26 and OR 27, both scheduled to being within 5 minutes of each other. He was also scheduled as an assistant surgeon in OR 25. He did not get to the procedure in OR 27 and that patient, who had been in the operating room all day until 4:45pm, was required to come back another day. The patient would have their incisions temporarily closed and be returned to the ICU to await completion of their surgery.

593828.1

93.     Moreover, after postponing the completion of these surgeries, Luketich would not prioritize these patients the next day, but rather would fit them in as he could among his scheduled outpatient surgeries.  As a result, the patients could be waiting in the ICU for days with temporarily closed wounds.  Because Luketich did not work on the weekend and would not allow other available attending surgeons to complete the surgeries, patients could be left waiting in the ICU over the weekend.  The patients' families would be told that the surgery was more complicated than anticipated and that it was good for the patient to "rest" in the ICU and have their surgery completed at a later time, none of which was true or medically indicated.  In fact, the practice of dividing surgeries was dangerous and resulted in harm to patients.

94.     This is an ongoing practice.  In addition to the harm to patients, upon information and belief this practice results in increased billing to the Government.

### D.     Luketich Routinely Billed for Medically Unnecessary Admissions in Order to Increase Billings and Have a Steady Stream of Patients Readily Available

95.     In addition to partially completing and staging surgeries, Luketich regularly improperly admits patients, knowing that he will not perform the surgery as scheduled.  Luketich has a large number of patients who are scheduled for outpatient procedures, but because he has so many procedures scheduled he knows at the outset of the day that he will not get to all the patients' procedures.  Nevertheless, he does not tell the patients this until the end of the day, and then admits the patients to the hospital based on a diagnosis, such as dehydration, that is not medically indicated nor supported by any diagnostic evaluation or treatment plan.  This practice serves several purposes.  First, it salves the anger of the patient and the patient's family who have waited all day, by making them feel they are being taken care of.  Second, it increases the amount billed for the patient

encounter and converts an outpatient to an inpatient at UPMC with all the associated increased costs. Finally, it ensures that Luketich has a steady stream of patients in the "on-deck" circle so that he can fill in space if he has a cancellation in his surgical schedule.

96.    As an example of this practice, on January 28, 2015, multiple patients were scheduled for surgery. The scheduling nurse sent an email at 8:30am asking whether Patient D would be admitted that night because they already knew their surgery would not happen that day. At the end of the day an attending physician sent a text to inquire whether the "cancelled" patients had been admitted.

97.    As another example of this practice, on November 11, 2013, Patient E was evaluated for a paraesophageal hernia repair, an elective procedure, and was admitted for three days before their surgery was ultimately performed.

98.    A particularly egregious example of this practice involved a Medicaid Patient F in July 2017 whose surgery was postponed for 15 days while she waited in the hospital.

### E.    Luketich Systematically Upcoded a Routine Procedure as a More Complex and Expensive Procedure

99.    A routine thoracic procedure is a "wedge resection" of the lung. The procedure involves removing a small wedge-like section of the lung using a thoracic stapler. This procedure can be used to obtain tissue for diagnosis, or to remove diseased section of the lung, or nodules. This procedure, which would take two to three hours, is coded as 32575 or 32506 and the average reimbursement by Medicare to the surgeon is $967 for the initial procedure and $163 for any additional sections of lung removed.

100.    A distinct and more technically demanding procedure is a lung "segmentectomy." This procedure involves removal of a segment of the lung and clear identification of specific veins, arteries, and airways. This procedure, which

26

would ordinarily take four to six hours, is coded as 32484 and 32488 and the average fee Medicare pays to the surgeon is between $1492 and $2498, depending upon how much of the lung is removed.

101.    Defendant Luketich routinely performed wedge resections and billed them as segmentectomies. In addition, he instructed residents to record the procedures in the operative report as a "nonanatomic segmentectomy." There is no procedure called a "nonanatomic segmentectomy." A segmentectomy is by definition anatomic because the vein, artery, and airway leading to the segment are identified and divided. The operative reports for these procedures show that the procedure involved cutting of a wedge of the lung with a thoracic stapler and definitively show that it is not the more involved segmentectomy procedure.

102.    This practice is harmful to patients. A patient who is told they are having a segmentectomy is anticipating having all of the cancer removed. A surgeon will remove all the disease that can be identified and remove a "margin" or additional tissue to ensure that all discernable cancer does not return and spread. A wedge cannot be used to remove anything other than a very small tumor; otherwise a segmentectomy is used. The risk of using a wedge where a segmentectomy is indicated is that all cancer cells may not be excised, increasing the risk the cancer will recur in the future. The patient may be unaware of this increased risk and in fact believe the risk has been decreased.

103.    Wedge resections are common thoracic procedures, which upon information and belief Luketich frequently performs. A significant number of these procedures were improperly upcoded as segmentectomies. Upon information and belief, Luketich rarely if ever performed actual segmentectomies.

104.    Luketich also miscoded and upcoded the procedure "lysis of adhesion" and/or "adhesiolysis." Depending upon the time and effort involved, lysis of adhesions may be billed separately or used as a means to demonstrate

increased procedural complexity. Luketich would instruct and or cause residents and other surgeons to add statements to the operative record that would allow for the increased billing for the lysis of adhesions performed during an operation. This practice was used to justify why surgeries were extended.

**F.    Other Harmful and Unlawful Practices**

105.    Luketich also engaged in a number of other procedures that were both harmful to patients and billed in violation of material requirements.

106.    For example while Medicare pays only for services that are medically reasonable and necessary, Luketich routinely performed and billed for services that were not medically indicated and medically unnecessary.

107.    For example, he used intrathoracic chemoperfusion on a patient without a known pathologic diagnosis of cancer type.

108.    In addition, Luketich operated on patients with metastatic cancer for whom surgery was not indicated. Surgery may be used as a treatment modality for various types of cancer when it is possible for the surgeon to completely remove a tumor or cancerous tissue. In the case of metastatic disease, the goal of complete resection (the removal of the cancer) cannot be achieved. Surgery is not used to treat metastatic esophageal cancer. However, Luketich does operate on metastatic cancer patients.

109.    Luketich also operates on patients with unresectable disease, such as patients who are diagnosed preoperatively with T4 disease. For example, in May 2015, a patient was transferred to UPMC after surgeons from another hospital discovered that the patients' esophageal cancer had invaded the aorta. This finding defined the patient disease as inoperable. Although the preoperative studies and operative reports from the transferring hospital and new imaging studies performed at UPMC confirmed that the cancer was inoperable, Luketich operated on the patient.

110.   Luketich has also been taking, Suboxone, an opiod, which has compromised his ability to perform appropriate medical services.  This drug is supplied to him by Dr. David Wilson, an employee of Luketich's department and to whom he instructs residents to refer pulmonary consultations.  Luketich instructed residents and other physicians to review their patient lists with Dr. Wilson on a daily basis and refer all pulmonary consults to him.  Luketich required residents and other physicians to be aware of Dr. Wilson's travel schedule so that they could refer consults to him if/when he is available.  Upon information and belief, the referrals are made in exchange for the Suboxone, in violation of the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b).

111.   Luketich has been known to be under the influence of Suboxone and fall asleep during surgeries.  The result of this conduct is that the services he provided and billed for were not the competent and compliant services that Medicare paid for, and in some instances were worthless.

### G.   Defendant UPMC Knows About Luketich's Conduct And Has Ignored It

112.   While Luketich's conduct and lack of concern for patient safety is deeply troubling, even more concerning is that it was widely known within UPMC and to UPMC administration and no effective action has been taken.  Luketich's conduct was not only an open secret, but also had been repeatedly called to the personal attention of UPMC leadership.  Persons to whom this was reported include, but are not limited to, Jonas Johnson, Head of Surgical Services, Joel Nelson, Head of UPP, Michael Anderson, Vice President of Human Resources, and Heather Redding, of Human Resources.

113.   Numerous reports to UPMC's Risk Master, an internal reporting system for physicians and staff to report serious patient incidents and events, did not result in corrective action.  For example on or about January 6, 2015, clinical

29

personnel reported that a patient had been left on the operating table for extended periods of time while Luketich was unavailable.

114. UPMC administration was aware of Luketich's overbooking of surgeries, and resulting harm, and only encouraged him to do less, but took no effective action to prevent him from continuing these practices.

115. For example, on January 7, 2015, Jonas Johnson, who has led the UPMC system wide surgical services program since 2013, wrote to Luketich following a report that he was out of the operating room for an hour during a procedure:

> Hi Jim,
>
> This is trouble
>  I suspect we would agree it is not good medicine
> At the very least it sounds irresponsible
> I recognize how busy you are
> And I understand that you are always multitasking
> But I think you must give the impression that your patients have your full and undivided attention during surgery
> Can you delegate some of your duties to others?
> That or you need to limit your commitment to the OR
>
> Jonas

Luketich did not change his conduct and UPMC did nothing to address it effectively.

116. A UPMC employee who worked on billing and coding for Luketich's Department raised concerns regarding these billing practices and was subsequently fired.

117. Given Luketich's position as Chairman of the Department of Cardiothoracic Surgery it is not surprising that UPMC took no action.

593828.1

118.    It was well known among doctors and trainees that individuals who spoke up about Luketich's practices would be subjected to retaliation by Luketich. Residents and fellows, who are dependent upon their supervisors, would not be in a position to speak up without potentially severe career consequences.   Moreover, those individuals who raised concerns and reported these practices were ignored.

119.    In fact, a survey of UPMC cardiothoracic residents conducted by a national organization revealed that residents fear retaliation if they raise concerns and further that they do not feel that they have adequate supervision.

120.   This is not the first time UPMC has been the subject of civil government investigations and civil lawsuits for similar behavior.

## VI.    DEFENDANTS' VIOLATIONS OF THE FALSE CLAIMS ACT

121.   By knowingly seeking payment for services provided in violation of material requirements of federal statutes and regulations, Defendants presented, or caused to be presented false or fraudulent claims for payment to the United States. The requirements are material to the government's payment decisions because they relate directly to how much the government pays for services, to violations of express conditions of payment, and the government will not pay for medically unnecessary services. Every document submitted or statement made to the United States in connection with requests for payment is a false or fraudulent claim for payment or approval.

122.   By knowingly seeking payment for medical services in violation of material regulatory requirements, Defendants also made or used or caused to be made or used, false records and statements material to these false claims for payment.

## COUNT I
## Federal False Claims Act
## 31 U.S.C. § 3729(a)(1)(A)

123.   Relator realleges and incorporates by reference the allegations in paragraphs 122.

124.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.,* as amended.

125.   Through the acts described above, Defendants have knowingly presented or caused to be presented to the United States false or fraudulent claims for payment or approval in violation of 31 U.S.C. §3729(a)(1)(A).

126.   The United States, unaware of the falsity or fraudulence of claims made or presented by Defendants, their agents, and employees approved, paid and continue to approve and pay claims that otherwise would not have been approved or paid.

127.   Defendants knew, both in fact and within the meaning of the Federal False Claims Act, that through the acts described above they would be violating the Federal False Claims Act, by getting false or fraudulent claims submitted or caused to be submitted by Defendants allowed or paid by the United States.

128.   Relator cannot now identify each of the false claims for payment that Defendants presented or caused to be presented because Relators have no access to records in Defendants' possession.

129.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount yet to be determined.

130.   The United States is also entitled to the maximum penalty under 31 U.S.C. § 3729(a)(1) for each and every violation alleged herein.

593828.1

## COUNT II
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

131.   Relator realleges and incorporates by reference the allegations in paragraphs 122.

132.   Through the acts described above, Defendants have knowingly made, used or caused to be made or used false records or statements material to false or fraudulent claims paid or approved by United States for work paid for by the United States in violation of 31 U.S.C. §3729(a)(1)(B).

133.   The United States, unaware of the falsity of the records or statements made or used by Defendants, their agents, and employees approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

134.   Defendants knew, both in fact and within the meaning of the Federal False Claims Act, that through the acts described above they would be violating the Federal False Claims Act, by making or using false statement or records material to false or fraudulent claims submitted by Defendants.

135.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount yet to be determined.

136.   The United States is also entitled to the maximum penalty under 31 U.S.C. §3729(a)(1) for each and every violation alleged herein.

## COUNT II
### Federal False Claims Act
### 31 U.S.C. § 3729(a)(1)(G)

137.   Relator realleges and incorporates by reference the allegations in paragraphs 122.

593828.1

138.   Through the acts described above, Defendants have knowingly made, used or caused to be made or used false records or statements material to an obligation to pay money to the United States and knowingly and improperly concealed, avoided, or decreased an obligation to pay or transmit money to the United States in violation of 31 U.S.C. §3729(a)(1)(G).

139.   Defendants knew, both in fact and within the meaning of the Federal False Claims Act, that through the acts described above they would be violating the Federal False Claims Act, by making or using false statement or records material to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

140.   By reason of the Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount yet to be determined.

141.   The United States is also entitled to the maximum penalty under 31 U.S.C. §3729(a)(1) for each and every violation alleged herein.

## PRAYER

WHEREFORE, Relator prays for judgment against Defendants as follows:

1.     that Defendants cease and desist from violating 31 U.S.C. § 3729, *et seq.*;

2.     that this Court enter judgment against Defendants in an amount equal to three times the amount of damages the United States has sustained because of Defendants' actions, plus a civil penalty for each violation of 31 U.S.C. § 3729, as provided in 31 U.S.C. § 3729 and adjusted for inflation, 28 C.F.R. § 85;

3.     that Plaintiff-Relator be awarded the maximum amounts allowed pursuant to § 3730(d) of the Federal False Claims Act;

34

593828.1

4.      that Plaintiff-Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5.      that the United States and Plaintiff-Relator recover such other relief as the Court deems just and proper.

## REQUEST FOR TRIAL BY JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff-Relator hereby demands a trial by jury.

Dated:  April 30, 2019

_____

PHILLIPS & COHEN LLP
Claire M. Sylvia*
csylvia@phillipsandcohen.com
100 The Embarcadero, Suite 300
San Francisco, CA  94105
Tel.: (415) 836-9000
Fax: (415) 836-9001

Amy L. Easton*
aeaston@phillipsandcohen.com
2000 Massachusetts Avenue, NW
Washington, DC 20036
Tel.: (202) 833-4567
Fax: (202) 833-1815

Jeffrey Dickstein*
jdickstein@phillipsandcohen.com
Southeast Financial Center
200 S. Biscayne Blvd., Suite 2790
Miami, FL 33131
Tel: (305) 372-5200

*Motion for admission Pro Hac Vice
to be filed*

35

STONE LAW FIRM, LLC
Andrew Stone
PA ID No. 35176
astone@stone-law-firm.com
437 Grant Street, Suite 1806
Pittsburgh, PA  15219
(412) 391-2005

Counsel for *Qui Tam* Plaintiff-Relator